CAMP WALDEN

*vs.*

ERNEST H. JOHNSON
STATE TAX ASSESSOR

Oxford.   Opinion, June 2, 1960.

*Berman, Berman, Wernick & Flaherty,*
*Locke, Campbell, Hebert & O'Connor,*
*Hutchins, Pierce, Atwood & Allen,* for plaintiff.

*Ralph W. Farris,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, SIDDALL, JJ.

SIDDALL, J. On Report. The appellant, a Maine corporation is engaged in the business of owning and operating a summer camp for girls located in Denmark, Oxford County, Maine, and known as Camp Walden.

The 99th Legislature by an act entitled "An Act Relating to Tax on Transient Rentals (P. L., 1959, Chap. 350), amended certain sections of the Sales and Use Tax Law (R. S., 1954, Chap. 17). The pertinent provisions of P. L., 1959, Chap. 350, are contained in sections 4 and 6 (amending R. S., c. 17, § 2), and read as follows:

> Sec. 4.
>
> " 'Retail sale' or 'sale at retail' means any sale of tangible personal property, in the ordinary course of business, for consumption or use, or for any purpose other than for resale, except resale as a casual sale, in the form of tangible personal property, **and any rental of living quarters in any hotel, rooming house, tourist or trailer camp.' "**

**Sec. 6.**

**" 'Tourist camp' means a place where 4 or more tents or tent houses, or camp cottages or other structures are located and offered by a person to the public or any segment thereof for human habitation."**

A tax of 3%, subject to certain exemptions which are not material to the issues of this case, was imposed "upon the total rental charged for living quarters, sleeping or household accommodations in hotels, rooming houses, tourist or trailer camps," P. L., 1959, Chap. 350, Sec. 7 (amending R. S., c. 17, Sec. 3).

After the passage of the act the appellee issued a bulletin entitled "Sales and Use Tax Instruction Bulletin #33" requiring camps making a lump sum charge for attendance, if the basis for the tax is to be less than the full charge, to break down its billing to show the charges for instruction, and for meals, as distinct from the charge for living accommodations. Such breakdown was required to be "realistic." Under these instructions the tax was to apply to the entire charge in the event that the bill was not broken down.

After the effective date of the legislation, the appellant entered into an agreement with a parent that her child could attend Camp Walden for the season of 1960, upon the payment of the required fee of nine hundred dollars. The parent was billed accordingly, without any breakdown, and the full amount of the bill was paid to the appellant, plus incidental charges, less a deposit of one hundred dollars. No sales tax was paid to the State Tax Assessor. The State Assessor assessed the appellant for a sales tax upon the entire amount of the transaction in the sum of twenty-seven dollars. The appellant duly filed a petition for reconsideration. The State Tax Assessor then refused to abate the assessment. The appellant duly appealed and filed an affidavit stating his reasons for appeal as required by R. S., 1954,

Chap. 17, Sec. 33, and served a copy thereof upon the appellee.

The case comes here upon an agreed statement of facts, to determine the sales tax liability, if any, under the facts agreed upon by the parties. The issues for consideration are as follows: (1) Under the provisions of R. S., 1954, Chap. 17, as amended, is the appellant liable for a sales tax? (2) If so, is the ruling of the appellee that the camp fee be broken down "realistically" or alternatively assessing the tax on the entire fee, arbitrary, unwarranted, and illegal?

The agreed statement recites at considerable length the nature of the business conducted by the appellant. The appellant, a Maine corporation, owns 45 acres of land located on Walden Pond in Denmark, Maine, consisting of land and numerous buildings including a main lodge, indoor gymnasium, infirmary, stable, thirteen so-called "bunks" for housing campers and counselors, canoe dock, shower house, small buildings for housing employees, and other incidental structures. The so-called bunks are wooden single story buildings without basements or foundations, with wide openings covered by screen paneling for summer use. Eleven of the bunks measure approximately 32' x 20'. The remaining two are approximately 32' x 32'. Four of the bunks have ten individual cots, seven have accommodations for twelve occupants, and two have accommodations for sixteen or seventeen persons. Only one has electric lights, and none has heating facilities or hot water. Each bunk has toilet and bathroom facilities but apparently no tubs or showers. The camp includes tennis courts, softball diamond, volleyball courts, riding ring, archery range, and bathing beach. The waterfront includes canoes, sailboats, rowboats, motorboats, and movable docks and floats. The camp is for girls between the ages of ten and sixteen, and the camping season lasts for approximately sixty days during the summer months. The average attendance for the last two years

has been 138. Each camper attends the camp for the entire season. Enrollment is completed prior to January 1st of the camp year, and no camper is accepted after the season has commenced. Prospective campers are selected after interviews. Physical examinations and certain inoculations and vaccinations are required of all campers and camp personnel. Two registered nurses are in attendance at the camp. No charge is made for the use of the infirmary or for the services of the nurses. Camp uniforms are required. Each camper brings her own bedclothing and makes her own bed. The camp staff in 1959 consisted of a director, assistant director, forty-two counselors (each of whom is assigned to a specific type of instruction), nurses, dietitian, cooks, dishwashers, waitresses, secretaries, bookkeepers, caretakers, grooms, and domestics. The adjustment of each individual is reviewed periodically and a written report sent to the parents at the end of the season. The schedule of each camper is prescribed, including the time of rising in the morning, meals, participation in activities, rest hour, and the time for retiring at night. Each camper is taken on trips away from camp for periods varying from six days and three nights to seventeen days and twelve nights, depending upon age. The schedule of instructions and activities is determined for each individual child. Among the activities provided are the following: swimming, canoeing and sailing, water skiing, basketball, softball, volleyball, tennis, horseback riding, archery, campcraft, dancing, dramatics, music, song writing, camp magazine, arts and crafts, nature studies, and tutoring. A single fee is charged for the entire camp season, covering all charges, with certain exceptions. The fee for 1960 is $900. The appellant has never broken down its charges as to instructions, use of facilities, trips, activities, meals, and living accommodations.

The fundamental rule in construing legislation is to ascertain the intention of the legislature and give effect thereto.

In the discovery of the legislative intent in the present case, we are guided by certain well established rules.

Words and phrases are construed according to the common meaning of the language, unless such construction is inconsistent with the plain meaning of the enactment. Rules of Construction, R. S., 1954, Chap. 10, Sec. 22, Par. I. See also *State* v. *Blaisdell,* 118 Me. 13, 15, 105 A. 359.

The intention of the legislature must be sought by an examination of all parts of a statute and not from any particular word or phrase. *Belfast* v. *Bath,* 137 Me. 91, 94, 15 A. (2nd) 249, citing *Rackliff* v. *Greenbush,* 93 Me. 99, 104, 44 A. 375.

The court, if possible, gives effect to every word, phrase, and clause contained in the statutory provision being interpreted. *Hudson Pulp and Paper Corp.* v. *Johnson,* 147 Me. 444, 448; 88 A. (2nd) 154.

It has been frequently said that " 'a thing within the intention, is as much within the statute, as if it were within the letter, and a thing within the letter is not within the statute, if contrary to the intention of it.' " *Holmes* v. *Paris,* 75 Me. 559, 561. *Steele* v. *Smalley,* 141 Me. 355, 358, 44 A. (2nd) 213.

Statutes imposing taxes are construed most strongly against the government and in the citizen's favor and may not be extended by implication beyond the clear import of the language used. *Portland Terminal Co.* v. *Hinds, et al.,* 141 Me. 68, 72, 39 A. (2nd) 5.

Does the term "tourist camp" have a common and accepted meaning among the people of this state? It undoubtedly has such a meaning. The state of Maine with its varied scenery and recreational facilities has for many years attracted tourists from all parts of the country. The increase in automobile transportation and the improvement of our

highways has made our lakes, seashore, and countryside more accessible not only to our own citizens but also to myriads of visitors from other states. Many enterprising citizens, recognizing the requirement of living or housing accommodations on the part of those temporarily away from home, have found it profitable to construct so-called camps or cabins to provide such accommodations. Structures of this type were erected in many parts of the state, some more elaborate than others. Some owners provided but one cabin or camp, others provided many. The main purpose of these camps or cabins is to provide temporary sleeping or housing accommodations, and any other service rendered to the guest is merely incidental thereto. The terms "tourist camp," "tourist cabin," "overnight camp," and "overnight cabin" have been interchangeably used by the public as the accepted designation of the type of building used for such a purpose. A group of such buildings is generally spoken of as a "tourist camp." Likewise, a residence in which temporary guests are received for the same purpose is commonly known as a "tourist home."

During the past quarter of a century many boys' and girls' camps, so called, similar to that operated by the appellant, have been conducted in the lake and shore areas of the state. Some are operated by private individuals or corporations, others by charitable associations or corporations. Some offer more services than others, but all operate on the same principle. The purpose of such camps is to provide, under proper discipline, for periods ranging from weeks to an entire season, a supervised program of instruction and recreation for boys and girls. The program provided is the inducement to attend the camp. The housing accommodations are merely incidental to that program. A camp of this nature is commonly and generally known as a "boys' camp" or a "girls' camp." The designation "tourist camp" is not used in reference to a camp of this nature, and we must con-

clude that the general use of the term has no application to the type of camp conducted by the appellant.

Does the statutory definition change the generally understood meaning of the term "tourist camp"? We think not. The nature of the operation of these camps are so well known that we must assume that the members of the legislature knew that a total aggregate fee is paid to cover the entire services provided by the camp, including instruction, supervision, food, lodging, and other services rendered to the campers, and that only a small part of the entire fee could possibly apply to cover living quarters. We feel that the failure of the legislature to establish some method of allocating the charge for living quarters is some indication that it did not intend to tax the fees charged by these camps. Furthermore, it appears that P. L., 1959, Chap. 350, for the first time brought rentals within the purview of the sales tax law. In addition to tourist camps the act applies to rentals from hotels, rooming houses, and trailer camps. In the case of hotels and rooming houses, the essential service rendered consists in providing sleeping or living quarters, and in the case of trailer parks in providing a space for an automobile trailer used for lodging. In all cases any additional service is incidental to the main service rendered. The same is true of a tourist camp in the accepted meaning of the term. A careful reading of the entire act leads us to the conclusion that the legislature in defining the term "tourist camp" did not intend to change the commonly accepted meaning of the term; that it did not intend to extend its meaning to include the authorization of a tax against the owner of a camp conducted in the manner in which the appellant's camp was conducted, where an entire lump sum is charged and where the living quarters are only incidental to a bona fide, organized, and disciplined program of instruction and recreation.

We therefore find that the act does not authorize the imposition of a sales tax for rentals against the appellant. The entry will be

*Appeal sustained. Judgment for appellant without costs. Tax abated. Case remanded to Superior Court for decree in accordance with opinion.*